UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

Nº 23-CV-4830 (RER) (LB)

———————————

TYRONE STERLING

VERSUS

UNITED STATES OF AMERICA

———————————

**MEMORANDUM & ORDER**

———————————

**RAMÓN E. REYES, JR., District Judge:**

Plaintiff Tyrone Sterling brings this action against the United States of America ("the government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, alleging that a government employee negligently caused a collision between a government car and his Fly-7 e-bike. (ECF No. 1 ("Compl.") at ¶¶ 41–43; Proposed Pretrial Order, ECF No. 21 ("Pretrial Order") at 3–4). The Court held a one-day bench trial on the issue of liability on February 3, 2025. (*See* Minute Entry, ECF. No. 26). After the trial, the parties submitted proposed findings of facts and conclusions of law, and oppositions. (ECF Nos. 29–32).

After considering the evidence introduced at trial, the arguments of counsel, and the applicable law, the Court sets forth the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. The Court concludes that Plaintiff has not met his burden to prove that the government is liable for this collision.

**FINDINGS OF FACT**

The following section constitutes the Court's findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1). These findings of fact are drawn from witness testimony at trial and the parties' trial exhibits. To the extent that any finding of fact reflects a legal conclusion, it shall be deemed a conclusion of law to that extent, and vice versa.

I.    The October 2, 2020, Collision

On the clear-skied afternoon of October 2, 2020, plaintiff Tyrone Sterling ("Plaintiff" or "Sterling") and Federal Bureau of Investigation ("FBI") special agent Sean Bartnik ("Agent Bartnik" or "Bartnik") collided in the intersection of Atlantic Avenue and Albany Avenue in Brooklyn, New York. (Pretrial Order at 8). Atlantic Avenue is a two-way highway with three lanes each for eastward and westward travel. (*See* ECF No. 27, Ex. L). Elevated tracks for the Long Island Railroad (LIRR) bisect Atlantic Avenue and beneath the tracks is an underpass through which westward drivers may make a protected left turn onto Albany Avenue. (*See* ECF No. 27, Ex. L; ECF No. 27, Ex. M; ECF. No. 27, Ex. Y). Albany Avenue permits southbound travel only. (*See* ECF No. 27, Ex. L). Before the trial, the parties stipulated to several facts. (Pretrial Order at 8–9). Here, the proverbial rubber meets the road on one issue: which party had the green light? Each party answers that he had the green light. (Trial Transcript ("(Tr.") 31:11–32:15; 77:7–16; *see also* ECF No. 27, Ex. K). Plaintiff, however, bears the burden of proof.

II.    The Fact Witnesses

a.  Tyrone Sterling

Sterling testified that before the accident, he left his girlfriend's house in Downtown Brooklyn and headed towards his mother's home in East New York. (Tr. 20:7–23). To

make the trip, Plaintiff borrowed an e-bike from a friend. (Tr. 21:13–17). Sterling then traveled eastward with another friend who rode his own e-bike. (Tr. 24:25–25:2). He testified that he was familiar with this route and that, on this day, traffic was light due to the COVID-19 lockdown having only recently been lifted. (Tr. 25:20–26:3; 26:7–13). As Plaintiff and his friend approached the relevant intersection, Sterling testified that he was traveling eastward on Atlantic Avenue, in the rightmost lane. (Tr. 26:14–27:5).

During his ride down Atlantic Avenue, Plaintiff noticed other vehicles traveling beneath the LIRR underpass, and, as he approached Albany Avenue, he noticed Agent Bartnik's car, a Hyundai Sonata, in the underpass's left turn lane. (Tr. 31:2–8). Sterling then looked up, saw that he had a green light, and proceeded to drive at approximately 20 miles per hour. (Tr. 31:11–21).

Plaintiff testified that there were no vehicles to his left as he approached the light at the Atlantic-Albany intersection. (Tr. 30:14–18). He did see other vehicles in front of him going through the light. (Tr. 27:6–10; 31:22–32:6). None were stopped. (Tr. 31:22–32:6). Sterling's friend also drove about 50 to 100 feet ahead and passed through the intersection. (Tr. 27:11–16). After checking the traffic light and noting that it was green, Plaintiff noticed that Bartnik "darted" out of the underpass's left turn lane. (Tr. 32:7–15). Plaintiff stated that he squeezed the brakes on the handlebars of the e-bike but did not have enough time to avoid Bartnik, so he braced for impact and collided into the Sonata's front passenger door. (Tr. 33:5–34:6; 35:16–36:13; ECF. 27, Ex. A). On direct examination, Plaintiff reiterated that he noticed the government's car around the same time that his friend drove through the traffic light. (Tr. 32:12–24). Sterling therefore placed himself about 50 to 100 feet from the intersection when he first noticed Bartnik stopped

in the government's car in the underpass's left turn lane. *Id.* After the collision, bystanders helped Plaintiff move the e-bike out of the street. (Tr. 37:21–38:8). Plaintiff later spoke to at least one police officer before being taken to a hospital in an ambulance. (Tr. 40:13:18).

Upon cross-examination, the government questioned Plaintiff's credibility in recalling the model e-bike he drove and its maximum speed capacity. During direct, Plaintiff claimed that he drove an e-bike that was older than a more current model named the Fly-7. (Tr. 22:4–22). On cross-examination, however, Plaintiff acknowledged that an accident report he filed claimed that the front wheel of a Fly-7 e-bike was damaged. (Tr. 43:6–44:20). The government later, during Sterling's cross-examination of Richard Hermance, cited to the parties' stipulated facts to show that Plaintiff agreed that he had driven a Fly-7 model e-bike. (Tr. 201:11–203:8; Pretrial Order at 8). Later during cross-examination, the government asked if Sterling's e-bike went 20–25 miles per hour, and Plaintiff responded that it went 15–20 miles per hour. (Tr. 47:8–15). The government then read two lines from Sterling's deposition:

"Question: Do you know how fast it goes, the maximum?"

"Answer: 20 to 25 miles per hour."

(Tr. 47:16–48:25). Lastly, during cross-examination, Plaintiff confirmed that his testimony was that Bartnik traveled from the underpass's turn lane to the collision point along the rightmost lane of Atlantic Avenue's eastbound traffic in about one second. (Tr. 60:6–61:7).

b.  Agent Bartnik

Agent Bartnik testified that before the collision, he left his workplace in Kew Gardens, Queens and drove the government-issued Sonata towards his home in Sunset Park, Brooklyn. (Tr. 69:6–70:19). He described traffic that day as being moderate-to-

heavy. (Tr. 72:14–18). He traveled westbound on Atlantic Avenue, but, before he reached the intersection with Albany Avenue, he first drove through the intersection of Atlantic Avenue and Troy Avenue. (Tr. 75:15–76:5). There, Agent Bartnik entered the turn lanes beneath the underpass, drove up to the stop line, and stopped the car as he had a red arrow traffic light. (Tr. 75:17–76:5). No other vehicles were stopped in front of Agent Bartnik. (Tr. 77:2–6).

Agent Bartnik then testified that once the red arrow switched to a green arrow, he checked the intersection for traffic. (Tr. 77:7–12). Noticing only stopped traffic in all Atlantic Avenue's eastbound lanes, he began to turn left onto Albany Avenue. (*Id*.) He stated that he began moving into the intersection "no more than a few seconds" after the light turned green. (Tr. 77:13–16). As he made the left turn, Agent Bartnik did not drive faster than 20 miles per hour. (Tr. 81:12–15). Yet Agent Bartnik did not detect Sterling approaching until Bartnik was "almost all the way through the intersection." (Tr. 77:22–78:4; 103:8–11). When he noticed that a "moped" was approaching, Agent Bartnik "gave a little blip of the gas" to get out of the way but was ultimately unable to avoid the collision. (Tr. 77:22–78:4). Indeed, Agent Bartnik testified that less than a second passed between his noticing Plaintiff and the collision. (Tr. 80:12–17). Agent Bartnik did not see any other e-bikes drive through the intersection before Sterling after the left turn signal became green. (Tr. 80:24–81:7).

After the collision, Agent Bartnik exited the Sonata, took pictures of the scene, and called 9-1-1. (Tr. 82:24–83:6; 84:5–11; 86:5–12; 88:8–15; 89:17–24). He testified that both parties spoke to a police officer. (Tr. 90:4–9). EMS personnel arrived later and spoke to Plaintiff but not to Agent Bartnik. (Tr. 90:12–21).

III.    The Government's Expert Witness – Richard Hermance

Richard Hermance ("Hermance") offered testimony as an expert witness in the field of accident reconstruction. (Tr. 119:17–22). Hermance is currently a principal of the consulting firm Collision Research, LTD. (*See* ECF No. 27, Ex. W ("Hermance CV")). He has performed accident reconstruction and analysis for over forty years and has taught numerous courses in accident reconstruction. (Tr. 115:6–8; 117:8–23; Hermance CV). He also holds separate associate's degrees in both electrical engineering technology and criminal justice from SUNY-Ulster. (Tr. 116:8–13; *See* Hermance CV). Lastly, Hermance is a member of professional organizations such as the International Association of Accident Reconstruction Specialists, the National Association of Traffic Accident Reconstructionists and Investigators, and the New York Statewide Traffic Accident Reconstruction Society, Inc. (Tr. 115:25–116:7; Hermance CV). The Court accepted Mr. Hermance as a qualified expert on accident reconstruction. (Tr. 120:4–5).

Hermance presented his expert testimony using a demonstrative PowerPoint presentation in which he argued eight main points: 1) Agent Bartnik's left turn signal was a protected green signal; 2) Agent Bartnik was traveling at approximately 13–15 miles per hour at the time of impact; 3) Agent Bartnik arrived in the intersection first; 4) immediately before the collision, Sterling drove an e-bike eastbound on Atlantic Avenue on the far-right side of traffic; 5) the collision occurred on the south-east side of the Atlantic Avenue-Albany Avenue intersection; 6) Plaintiff's e-bike "t-boned" Agent Bartnik's Sonata on the right passenger side; 7) Agent Bartnik could not have avoided the accident; and 8) Sterling could have avoided the accident. (Tr. 120:7–20; 121:6–123:25; (ECF No. 28 at 2–9)). On direct, Hermance also testified to being familiar with accidents involving two-

wheeled vehicles and to having reconstructed approximately five or six hundred accidents involving such vehicles. (Tr. 115:15–20). As explained further below, the Court excludes some of Hermance's opinions as they go to the ultimate legal issue of liability or can be adequately testified to by other percipient witnesses. The Court does, however, find that the questions about Bartnik's acceleration rate, the speed the parties drove prior to and during the collision, the amount of time each party spent in the intersection before the collision, and the distance Bartnik traveled after the collision to be questions within Hermance's expertise to which a layperson cannot adequately testify.

Hermance first described how he prepared for his reconstruction of the accident. He testified that he examined the police report, FBI report, photographs of the scene taken that day, specifications of each vehicle and crash tests, an exemplar Fly-7 e-bike, and the depositions of Plaintiff and Agent Bartnik. (Tr. 124:1–14). Hermance then used Google Pro aerial and street view imagery along with the Google Pro measuring tool to assist his reconstruction and analysis of the accident. (Tr. 124:14). Hermance then, on direct, went through the methodologies he used to arrive at his opinions.

To calculate the speed of Agent Bartnik's Sonata, Hermance conducted an "energy dissipation analysis" and an "acceleration analysis," which can also be called a "time-and-distance analysis." (Tr. 135:1–13). To conduct the time-and-distance analysis, Hermance used the mathematical formula of the square root of the original speed plus the product of 30 times distance times friction or acceleration. (Tr. 135:16–19). This formula should reveal how fast a vehicle traveled from the point of take off to the point of impact when moving at a normal acceleration rate. (Tr. 135:23–136:1). The square root of the original speed would be zero since Agent Bartnik started in a stopped position. (Tr. 136:2–4).

7

Hermance then testified that the number 30 is used to ensure that the product is converted into miles per hour instead of feet per second. (Tr. 136:5–7). For distance, Hermance used Google Earth as a measurement tool and determined that Agent Bartnik traveled about 40 feet from the stop line to the point of impact. (Tr. 136:8–9, 17–19). For the friction or acceleration factor, Hermance first used 4.8 for the acceleration *rate*, as it is the industry standard for a passenger car that takes off at less than 20 miles per hour. (Tr. 137:10–138:4). Then, to convert the acceleration rate to an acceleration *factor* that is used in the formula, Hermance divided 4.8 by 32.2 (force of gravity) to arrive at an acceleration factor of .15. (Tr. 138:5–22). Once each number is plugged in, the time-and-distance equation calculates that Agent Bartnik traveled at 13.5 miles per hour, which Hermance rounded up to 14 miles per hour. (Tr. 138:23–139:5).

Hermance then used the previously mentioned energy dissipation analysis to check if his time-and-distance calculation was correct. (Tr. 139:6–10). This analysis essentially calculates how much kinetic energy a vehicle contains to determine its speed. (Tr.139:11–23). For this analysis, one must find the square root of the product of 30 times distance times friction/acceleration. (Tr. 139:24–140–8). One calculates the distance by measuring the deceleration rate or the distance a vehicle skids before coming to a complete stop. (Tr. 141:1–2). Here, Hermance measured the distance from the point of impact to the point where Bartnik's Sonata came to a complete stop at 10 feet. (Tr. 141:4–22). Friction was also calculated differently for this formula. Here, Hermance used the number .7, as that is the industry standard for vehicles traveling on a dry roadway. (Tr. 142:14–143:6). With these numbers, Hermance determined that Agent Bartnik was

driving the Sonata at a speed of about 14.5 miles per hour upon impact with Sterling. (Tr. 143:7–10).

Hermance next testified as to how he determined that Agent Bartnik entered the intersection first. (Tr. 144:13–19). For his methodology, Hermance testified that he used the normal acceleration rate of a car and time-and-distance calculations. (Tr. 145:4–9). To assist him in making those calculations, Hermance used photos of the accident and superimposed those photos on an aerial view of the intersection from Google Maps. (Tr. 145:10–146:8). He also used the manhole cover that was located within the southern crosswalk of Albany Avenue to assist his distance measurements. (*Id.*) Hermance first determined that Agent Bartnik traveled approximately 41 feet from the takeoff point to the point of impact. (Tr. 147:7–12). Hermance then used another mathematical formula to determine how many seconds Agent Bartnik would have been in the intersection. (Tr. 146:9–147:1). Hermance used .249 as a conversion factor to convert the answer into seconds and multiplied that conversion factor by the square root of the quotient of the distance in feet that Bartnik traveled divided by the acceleration or friction rate and then added that result to Bartnik's perception-reaction time. (*Id.*) Here, the distance would be 41 feet, the acceleration rate would be the standard 4.8, and the perception-reaction time would be zero since Bartnik was initially at a stopped position. (Tr. 147:7–148:2). Hermance thus determined that Agent Bartnik would have been in the intersection for about 4.1 seconds. (Tr. 148:3–9). Hermance even performed this equation with an assumption that Bartnik accelerated rapidly. (Tr. 148:10–149:2). Under that assumption, the industry standard acceleration rate would increase from 4.8 to 9.7. (Tr. 148:14–18). Hermance then testified that Bartnik would have been in the intersection for 2.9 seconds

if he had accelerated rapidly. (Tr. 148:24–149:2). Hermance therefore concluded that Bartnik would have defied the laws of physics if he would have driven from the stop lane to the point of impact in one second. (Tr. 149:3–6; 192:19–193:16).

Hermance also opined on how long Plaintiff would have been in the intersection before the collision. (Tr. 149:7–9). Since Sterling was moving at a constant rate of speed rather than taking off from a stopped position, Hermance used a different formula: Plaintiff's distance traveled in feet was divided by velocity in feet per second to equal time as measured in seconds. (Tr. 149:10–150:5). For distance, Hermance measured the distance in feet from the west side of the intersection to the point of impact and determined that the distance was 12 feet. (Tr. 150:9–16). For velocity, Hermance used 15 miles per hour—the lower end of Sterling's averred range of speed—and then multiplied that number by a conversion factor of 1.46 to arrive at 21.9 feet per second. (Tr. 150:17–151:10). With a distance of 12 feet and a velocity of 21.9 feet per second, Hermance opined that Plaintiff traveled in the intersection for about .54 seconds at 15 miles per hour before impact. (Tr. 151:11–14). From these calculations, Hermance testified that Sterling had time to react and avoid the collision, but Agent Bartnik did not. (Tr. 151:15–152:4; 156:18–157:4; 163:24–164:3).

Hermance also spent a significant amount of time discussing Agent Bartnik's ability to notice Plaintiff approaching on the e-bike and likely reaction time. (Tr. 162:12–163:16; 220:20–223:9). The Court, however, finds that such testimony on reaction times and the possible effects of seeing another e-bike drive through the intersection before Sterling falls outside of Hermance's expertise and therefore excludes Hermance's testimony on how quickly Agent Bartnik would have noticed Plaintiff approaching on an e-bike and how

quickly Bartnik would have been able to react after noticing Sterling. *See Moncayo v. United Parcel Service, Inc.*, No. 23-161-cv, 2024 WL 461694, at *1 (2d Cir. Feb. 7, 2024) (summary order) (affirming the District Court's ruling that opinions on psychological and human factors, such as whether a driver was distracted, fell outside of the expert's fields of expertise—engineering and accident reconstruction).

The Court also excludes Hermance's testimony about whether Agent Bartnik had a protected green light, (Tr. 121:9–122:11; 173:3–11), as that testimony mixes with the ultimate legal question of whether Bartnik negligently caused the collision. Under New York State traffic law, if a driver runs a red light, that party is per se negligent. VTL § 1111(d)(1); *Callahan v. Glennon*, 193 A.D.3d 1029, 147 N.Y.S.3d 665, 666 (2d Dep't 2021) (citing *Barbieri v. Vokoun*, 72 A.D.3d 853, 856 (2d Dep't 2010)) (citations omitted). Therefore, Hermance's testimony that Bartnik had a protected green light implies that Plaintiff was per se negligent. For similar reasons, the Court does not consider Hermance's opinions that Agent Bartnik could not have avoided the collision, but Sterling could have avoided the collision—though the Court does find Bartnik's underlying calculations for those two opinions to be credible and within his area of expertise.

The Court also does not consider Hermance's testimony on where Sterling was traveling on Atlantic Avenue, the location of the accident, or the type of impact between the Sonata and the e-bike because such information may be testified to by a layperson. (Tr. 152:5–156:17); *see also United States v. Thomas*, 214 F. Supp. 3d 187, 191 (E.D.N.Y. 2016) ("Expert witnesses are unnecessary when the factfinder is 'as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training.'") (quoting *Salem v. U.S. Lines Co.*,

370 U.S. 31, 35 (1962)) (citations omitted). Indeed, the parties stipulated to some of these facts in the pretrial order. (*See* ECF No. 21 at 8–9).

In sum, the Court finds that Hermance credibly testified that Agent Bartnik accelerated from the stop line at a normal acceleration rate, that Bartnik traveled up to 14 miles per hour when making his left turn, that Bartnik drove in the intersection for about 4.1 seconds before the collision, that Plaintiff drove in the intersection for about .54 seconds before the collision, and that Bartnik traveled about 10 feet after the collision before coming to a complete stop.

IV.    Credibility Determinations for Fact Witnesses

The plaintiff shoulders the burden to prove their claims by a preponderance of the evidence. *See Moudis v. United States*, No. 20-CV-05674 (JMA) (AYS), 2024 WL 3063793, at *2 (E.D.N.Y. June 20, 2024). Courts often describe this burden as persuading the fact finder to believe the facts supporting each element are more likely to exist than not exist. *See Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n. 9 (1997) (citations omitted). In other words, where "the evidence is evenly balanced," a plaintiff falls short. *Kasokow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 731 (2d Cir. 2001); *accord United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996). Following a bench trial, the court has considerable discretion to determine the testimony that should and should not be credited, and to what extent. *See Moudis*, 2024 WL 2063793, at *3 (first citing *Diesel Props S.r.l. v. Greystone Business Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011), then quoting *Cont'l Ins. Co. v. Lone Eagle Shipping (Liber.)*, 134 F.3d 103, 104 (2d Cir. 1998)).

The Court ultimately finds Agent Bartnik's testimony to be credible, and Sterling's testimony about the collision to be incredible. Agent Bartnik's testimony aligns with common sense and the accepted expert opinions of Hermance. Bartnik was the first car at the underpass's traffic light, and Plaintiff failed to present any evidence that Bartnik was distracted for the entire period of a protected green turn signal and then only began driving once the light had turned from green to red. Bartnik's testimony that he accelerated from his stopped position at a normal, rather than a rapid, acceleration rate also aligns with the evidence that Bartnik stopped about 10 feet from the point of impact. Finally, Bartnik's testimony that other cars were present in the eastbound lanes of Atlantic Avenue provides a more compelling explanation as to why neither driver adjusted their speed or direction in a timely manner to avoid the collision.

While the Court credits Sterling's testimony as to the fact that he traveled eastward down Atlantic Avenue after leaving his girlfriend's home in Downtown Brooklyn to visit and care for his mother in East New York, the Court does not credit the remainder of his testimony. Plaintiff presented conflicting testimony as to the speed he was traveling down Atlantic Avenue. At the bench trial, Sterling testified that he was traveling 15–20 miles per hour. However, on cross-examination, Plaintiff conceded to testifying at his deposition that he traveled at 20–25 miles per hour. Plaintiff also testified that he did not drive a Fly-7 model e-bike. Yet, on cross-examination, Plaintiff had to concede that he not only signed an accident report where he stated that he drove a Fly-7 but that he stipulated in a pretrial order to the fact that he drove a Fly-7 on October 2. Further, the Court does not find credible Sterling's testimony that he drove on Atlantic Avenue, among light traffic, saw the Sonata, checked the traffic light, and then, in the next second, saw the Sonata

"darting" into the intersection in front of Plaintiff with no time for Sterling to react. Put simply, the Court is not persuaded that Plaintiff would have lost the Sonata from his field of vision from checking the traffic light, especially if traffic was light and no other vehicles blocked Sterling's field of vision. Even if Bartnik drove into the intersection when Plaintiff still had a green light, then, assuming that Sterling was 50 to 100 feet from the intersection and was driving 15 to 20 miles per hour, Plaintiff would have been able to react by slowing down and moving to a lane to his left to possibly avoid the collision. The Court also credits Hermance's testimony over Sterling's that Bartnik could not—within the laws of physics— have traveled from a stopped position to the point of impact in one second or even in under two seconds.

V.      Final Factual Findings

The Court therefore makes the following findings of fact: on October 2, 2020, before the vehicle collision, Plaintiff traveled eastward on Atlantic Avenue from Downtown Brooklyn to East New York to visit his mother. Agent Bartnik first traveled westward on Atlantic Avenue from his place of employment in Kew Gardens as part of his route to go home in Sunset Park. Bartnik then drove into the underpass after passing Troy Avenue and stopped at the traffic light at the Atlantic Avenue-Albany Avenue intersection planning to turn left into southbound Albany Avenue. Sterling drove on Atlantic Avenue around 20 miles per hour following a friend who was also traveling by e-bike. Plaintiff noticed the Sonata in which Bartnik drove around the same time that Sterling's friend drove through the traffic light. At that point, Plaintiff was between 50 to 100 feet away from the intersection. Agent Bartnik began driving into the intersection and making a left turn once he had a protected left turn signal. Sterling, missing the green light, attempted to run the

red light and beat oncoming traffic but instead "t-boned" Agent Bartnik. Plaintiff stopped at the point of impact and debris from the e-bike broke off and landed at that location. Agent Bartnik continued accelerating when he noticed an oncoming object to his left and then braked after the collision and stopped about 10 feet from the point of impact. Agent Bartnik exited the Sonata, took pictures of the vehicles and the area of impact and then called 9-1-1. Both Sterling and Agent Bartnik spoke to police officers about the collision, and Plaintiff was then taken to the hospital by an ambulance.

## CONCLUSIONS OF LAW

After considering the trial testimony and all the evidence, the Court concludes that Sterling has failed to carry his burden to show by a preponderance of the evidence that Agent Bartnik negligently caused the collision.

I.      Hermance's Expert Testimony is Reliable

During the trial, Sterling's counsel aggressively cross-examined Hermance and challenged many of his opinions and assumptions. (*See* Tr. 177:2–230:14). In his post-trial submissions, Sterling appears to challenge the reliability of Hermance's testimony and opinions. (Pl's Proposed Findings of Fact and Conclusions of Law, ECF No. 30 at ¶¶ 27–49; Pl's Response to Defendant's Proposed Finding of Facts and Conclusions of Law, ECF No. 32 at ¶¶ 2–7). For example, Sterling argues that "close analysis of [Hermance's] testimony shows his account was based almost exclusively on the use of facts cherry-picked from the defendant's own account, and was replete with unsupported assumptions chosen specifically to buttress the defendant's position." (ECF No. 30 at ¶ 27). Because I conclude that Hermance's trial testimony was reliable and relevant, except for his legal conclusions, Hermance's expert testimony is admitted.

The court must ensure that a qualified[1] "expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). "In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation marks and citation omitted) (quoting Fed. R. Evid. 702). In analyzing whether proffered expert testimony is relevant, the trial court should look to the standards of Rule 401, i.e., whether it "'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 184 (2d Cir. 2001) (quoting Fed. R. Evid. 401).

Federal and state courts have also long found accident reconstruction analysts to be acceptable expert witnesses in vehicle collision personal injury actions. *See Dooley v. United States*, 577 F. Supp. 3d 229, 233 (S.D.N.Y. 2021) (citing *Haines v. Webb*, 2014 WL 12828962, at *10 (N.D. Ga. Sept. 26, 2014)), aff'd, 83 F.4th 156 (2d Cir. 2023); *see also Boykin v. Western Express, Inc.*, No. 12-CV-7428 (NSR) (JCM), 2015 WL 539423, at *6 (S.D.N.Y. Feb. 6, 2015) (collecting cases); *Robinson v. District of Columbia*, 75 F. Supp. 3d 190, 197–201 (D.D.C. 2014) (finding the defendant's proposed accident reconstruction expert to be qualified and his proffered opinions reliable); *DeSisto v. New*

---

[1] Sterling does not challenge Hermance's qualifications to testify as an expert in accident reconstruction.

*York City Transit Auth.*, 151 A.D.2d 639, 640 (2d Dep't 1989). Hermance, specifically, has often been accepted as an accident reconstruction expert witness. *See e.g., Salahuddin v. United States*, 564 F. Supp. 3d 75, 81–83 (E.D.N.Y. 2021); *Smith v. United States*, 752 F. Supp. 3d 242, 257–58 (D. Mass. 2024); *McChristion v. Sun Life Assurance Co. of Canada*, No. 1:121-CV-332, 2022 WL 18107287, at *6 (W.D. Tex. Oct. 24, 2022); *DiPirro v. United States*, 43 F. Supp. 2d 327, 337 (W.D.N.Y. 1999). Here, the Court has already excluded portions of Hermance's testimony for falling outside the scope of his expertise or for covering issues within the knowledge of fact witnesses. For the remaining disputed portions of Hermance's testimony, the Court finds that they are reliable.

Plaintiff did not argue that Hermance's methodology "failed to demonstrate the rigor" used by other accident reconstructionists or that Hermance's formulas were not generally accepted within his field of expertise. Rather, Plaintiff first asked the Court to "look past all the obfuscations and complex formulas." (ECF. No. 30 ¶ 32). Plaintiff then argued that Hermance's use of the industry standard acceleration rate belied notions of "common sense and real-life experience." (*Id*. ¶ 36). Plaintiffs remaining protestations fell under categories of either disagreeing with the results of Hermance's calculations or arguing that Hermance included erroneous assumptions in his calculations. (*Id*. ¶¶ 38–41). Sterling's last argument about erroneous assumptions is his strongest, but all remain unpersuasive.

The Court must look to the reliability of the "principles and methodology" used, not the result of the methodology, to determine if an expert's opinion is reliable. *Salahuddin*, 564 F. Supp. 3d at 84 (quoting *Amorgianos*, 303 F.3d at 266). Expert opinions are often needed because they reveal that common sense is misleading or falls short. The Court

therefore cannot find that Hermance's opinions should be excluded because they conflict with common sense ideas about how vehicles accelerate. Rather, Plaintiff needed to show that Hermance did not use an industry standard method to measure the acceleration rate. Sterling failed to do so. Indeed, Hermance also conducted his analysis under Plaintiff's assumption that Hermance accelerated rapidly. (Tr. 148:10–149:2). Lastly, Hermance explicitly stated that he disregarded many of Plaintiff's allegations because they violated the laws of physics, (Tr. 225:21–23), and Plaintiff failed to show that Hermance's assertion was erroneous. The Court therefore finds that Hermance's expert testimony was reliable.

II.     Liability

The FTCA waives the United States's sovereign immunity and permits personal injury claims against it for the negligence of government employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1); *see Liranzo v. United States*, 690 F.3d 78, 84–85 (2d Cir. 2012). Under the FTCA, liability of the United States for the negligence of its employees acting within the scope of employment is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Here, the accident occurred in New York; thus, New York law applies. *E.g., Avlonitis v. United States*, No. 16-CV-2521 (PKC) (SMG), 2020 WL 1227164, at *5 (E.D.N.Y. Mar. 13, 2020).

Under New York law, negligence requires a plaintiff to establish by a preponderance of the evidence that the defendant (1) owed a duty to the plaintiff, (2) breached that duty, and (3) the breach was the substantial cause of plaintiff's injury. *Hodder v. United States*, 328 F. Supp. 2d 335, 341 (E.D.N.Y. 2004) (citation omitted); *see*

*also Ferreira v. City of Binghamton*, 38 N.Y.3d 298, 308 (2022) (quoting *Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985)) (citations omitted). New York's Vehicle and Traffic Law ("VTL") imposes a duty on drivers to exercise reasonable care in the operation of their vehicles, considering "actual and potential dangers existing from weather, road, traffic, and other conditions." *Hodder,* 328 F. Supp. 2d at 341 (citations omitted)). All drivers in New York are held to a four-part duty: "(1) to maintain a reasonably safe rate of speed; (2) to have their automobiles under reasonable control; (3) to keep a proper lookout, under the circumstances then existing, to see and be aware of what was in their view; and (4) to use reasonable care to avoid an accident." *Id.* (internal citations omitted); *see also Daniels v. Amazon.com* Inc., No. 20-CV-3708 (MKB) (RML), 2021 WL 4272542, at *4 (E.D.N.Y. Sept. 21, 2021) (same). In addition, drivers commit a *per se* act of negligence if they violate the provisions of the VTL. *Desio v. Cerebral Palsy Transport, Inc.*, 121 A.D.3d 1033, 1034 (2d Dep't 2014); *Burghardt v. Cmaylo*, 40 A.D.3d 568, 569 (2d Dep't 2007); *Christian Sanchez v. U.S.*, No. 13-CV-2536 (JPO), 2015 WL 667521, at *2 (S.D.N.Y. Feb. 17, 2015) (citing *Gray v. Wackenhut Servs., Inc.*, 446 F.App'x 352, 354 (2d Cir. 2011) and *Jones v. Radeker*, 32 A.D.3d 494, 496 (2d Dep't 2006)).

Applying these principles, the government is not liable for the collision between Agent Bartnik's Sonata and Sterling's Fly-7 e-bike. Sterling argues that Agent Bartnik negligently drove through a red light, in violation of VTL §§ 1111(d)(1), (d)(3), and negligently turned left without yielding to approaching vehicles with the right of way, in violation of VTL § 1141. (Tr. 31:2–34:17; ECF No. 30 ¶¶ 56–63).[2] As the Court found

---

[2] Section 1111(d) of the VTL requires traffic "facing a steady circular red signal ... [to] stop ... and ... remain standing until an indication to proceed is shown." VTL § 1111(d). Section 1141 of the VTL requires a driver

above, however, Agent Bartnik credibly testified that he turned left when his traffic light turned green, and that Sterling drove his e-bike through a red light and t-boned Agent Bartnik.

Bartnik drove at a reasonable speed of 14–15 miles per hour and checked eastbound traffic before turning. (Tr. 138:23–139:5, 143:7–10; Tr. 77:7–16). Bartnik was unable to yield to Sterling because he only noticed Sterling when they were both in the intersection, and Sterling was in the intersection for less than a second. (Tr. 151:15–152:4; 156:18–157:4; 163:24–164:3). Sterling, on the other hand, noticed Bartnik when Sterling still had a green light, Bartnik had a red light, Sterling was approximately 50 to 100 feet away from the intersection. (Tr. 32:12–24). Sterling therefore had time to adjust and avoid a collision with Bartnik. The Court therefore cannot find that Bartnik breached his duty to Sterling when he made a left turn from Atlantic Avenue into Albany Avenue and so cannot find the government liable in this action.

## CONCLUSION

After considering the trial testimony and all the evidence, the Court finds that Sterling failed to carry his burden to show by a preponderance of the evidence that Agent Bartnik negligently caused the October 2, 2020, collision at the Atlantic Avenue-Albany Avenue Intersection. The government therefore is not liable. The Clerk of Court is respectfully directed to enter judgment for the United States and close this case.

---

turning left at an intersection to "yield the right of way to any vehicle approaching from the opposite direction which is within the intersection or so close as to constitute an immediate hazard." VTL § 1141.

SO ORDERED.

Hon. Ramón E. Reyes, Jr.    Digitally signed by Hon. Ramón E. Reyes, Jr.
Date: 2025.09.29 11:05:59 -04'00'

_____

RAMÓN E. REYES, JR.
United States District Judge

Dated: September 29, 2025
        Brooklyn, New York